Good morning. My name is Colin Jorgensen. I represent the four appellants in this matter, employees of Benton County, Arkansas, who worked in the Benton County Jail at the relevant time, Spencer Williams, Desiree McCain, Greg Hobelman, and James Cody Smith. The county appellants asked this Court to reverse the District Court's summary judgment order denying them qualified immunity and either dismiss the complaint against them or remand with instructions to grant qualified immunity to the individual county appellants. The undisputed facts and evidence submitted on summary judgment are critically important to qualified immunity analysis, and so I've dedicated half of the appellant's brief to recitation of the facts with citations in this case to try to assist the Court. Counsel, do you contend there are any disputed facts in this case? Not that are material, Your Honor. I've overloaded the brief with, and I also came very close to the word limit. I apologize for that. It's mostly because of those facts. I've also done that so you can see exactly what the evidence shows in this case and what the evidence does not show. What would you say the non-material disputed facts could be? That may itself be disputed between the two of you as to whether the disputed facts are material or not. Right, Judge Smith. I'm not aware of a contention for the appellee that there's a disputed fact that is material. I suppose the timing of one paragraph in Desiree McCain's incident report is disputed, and that's the closest thing there might be to one that could be considered material. But I would argue that it doesn't really matter where in the timeline that paragraph fits for purposes of how to resolve this case. So we don't need to decide one way or the other on that. Everything else is, there's not really two sides here. There's all the evidence. We have a question, counsel. Yes, Judge Arnold. I have a procedural question. The nurse who was a defendant in the case, I believe her name was Stevens, is that right? Yes. She's not here. What happened in the trial court with respect to her? She is a defendant below, and she moved for summary judgment. It was her summary judgment motion. She's separately represented. She's not a county employee. She's a private medical provider employee. And her summary judgment motion was also denied by the district court in the same order, and she has not taken an interlocutory appeal. She was denied. She moved for summary judgment based on qualified immunity, too? Correct. Okay. But she didn't appeal. She did not appeal. Okay. Thank you. And there's also another nurse who was involved in Mr. Reese's care who was never made a defendant. Yes. Right. And there are several other jail employees who had interaction with Mr. Reese that are not parties. I have included in the facts everything that's in the aggregate incident report that can be determined from the video and the timeline that staff put together, including things that no defendant in front of this court knew at the time. But that is because both the district court and in briefing Ms. Reese have referenced those facts, and I want the court to be clear that, yes, you know, for example, Deputy Cogdill at 5.06 a.m. made some observations and had a conversation with Mr. Reese. But no one else was involved in that. He's not a party to this case. He did not report any of that to anyone. So the defendants before this court today have no knowledge of those facts. And there are other facts like that in this case, too. What's important is that we determine what these individual defendants actually knew and did not know. What does the record show at what point the detaining officials, the defendants here, were aware that the decedent in this case had ingested methamphetamine or was under the influence of methamphetamine? That would have been after at about between 7.30 and 8.00, which is two and a half to three. He came into the jail at 7.30. He was in a cell by himself without a camera, so he could only be observed by people checking on him at the door for that whole time leading up to then. He began punching the wall, and Desiree McCain, booking sergeant in charge of this area of the jail, ordered him to put him in a restraint chair for his own safety. This is something that she did to protect him. And then at that point, the nurse was there, and McCain, Hobelman, and the nurse each had conversations in turn. I'm not sure if it was that order, but all three of them talked to Mr. Reese during this time and asked him about his drug use, and he gave some answers. I believe he admitted to specifically methamphetamine use to Hobelman a few days ago. He didn't admit to anything specific to Ms. McCain, but he did tell the nurse he had done methamphetamine, and she asked him if he did his usual amount to try to determine whether this was just normal meth intoxication or something more dangerous, and his response to the nurse was, yes, maybe a little more of the meth. Let me ask you about Hobelman and McCain contacting the nurse. I have a note here, you can tell me it's wrong, that Hobelman was the one who contacted Nurse Stevens, it was not McCain. Am I wrong about that? They both requested the nurse. Hobelman is, he pretty much went and got her and brought her to the scene. From everybody else's perspective, it looked like Hobelman was the one who asked for the nurse, but McCain had also put in a request for the nurse to come over from the desk. Is there any dispute about that as to whether or not McCain was involved in requesting the nurse? I don't believe so. Not to my knowledge, not so far. Well, let me just, let me follow up, because I'm a little, the defendant that concerns me the most here, and I'm going to give you a chance to respond, is McCain. McCain had the longest interaction with him. She saw him deteriorating, so he went from, and I've got some quotes here, from experiencing symptoms of perhaps withdrawal to becoming more obnoxious and more off-putting until eventually he was sweating profusely and became frantic. So she saw him decline, and you know, I have to look into the nurse issue, but why is she entitled to qualified immunity? If you see somebody who is undergoing some serious physical reaction and is declining, why didn't she have a responsibility to do more? She, she did have a responsibility to act when she made those observations, but she actually made those observations after Mr. Reese came under a nurse's care, and she knew that Mr. Reese was already under a nurse's care. If, if that had not been the case at that time, then yes, she would have had an obligation to provide, to summon medical care for him, have him medically evaluated. But that had already happened earlier. So it, Kathleen, it's your position then that the behaviors observed by the staff were not such that they would have put a reasonable person on notice that there was a medical emergency requiring professional attention? The beginning, I would say that there are some behaviors beginning with Mr. Reese throwing his out in the restraint chair and being sweaty at that time. This is about 7.30. Beginning at that time, yes, there are, there are indications that he should be medically evaluated, and that's why he was at 7.40 a.m. medically evaluated by the nurse. She took his vitals. She got blood pressure medication prescribed for him. Hobelman administered the blood pressure medication and provided water and instructed everybody, including McCain, to keep an eye on him and let him have all the water he wants and keep an eye on his breathing, because that's what the nurse told Hobelman, to have everybody do. And from that point forward, he was under the nurse's care, two nurses, actually, but starting with Nurse Stevens. And there's a lot of facts from that point forward that would indicate that he needs medical care, but he was under medical care. He'd been provided medication. The nurses were keeping an eye on him, or they were supposed to. And these four jail employees who are involved in this appeal are, none of them are medical, medically trained in any way. They're just like the reasonable person, you know, at best, in terms of their knowledge and experience. And they did summon medical care when, when it became apparent to Hobelman and McCain, based on what they saw, they did. Judge Strauss, you're, you're reference, you're referring to the paragraph in McCain's report that starts a short while later, I'm sure. And I just, I, I think you can reach the same result, regardless of whether you view that as placement in time right after 5 a.m. or put it after 8.30 when he's in the detox cell, as McCain has testified, that that's when she made those observations. The record allows you to independently verify McCain's explanation of that, that these observations could not have been made a short before 7.14 a.m., actually, because there's no camera in the cell that Mr. Reese was placed in. Cell number seven. After intake, for that first two and a half hours, the same cell where he was throwing his tray, she couldn't see in without going to the door and looking in. And there's video of that door. It's been reviewed carefully, and every person who checked on him during this 5 a.m. to 7.30 a.m. time is documented. And the only time McCain checked on him was 7.14 a.m. He was checked a lot by others throughout that time, but there's no possibility that McCain could have observed anything regarding him except for at 7.14 a.m. when she looked into his cell. And it was 15 minutes later that he began punching the wall. She had him placed in the and by 7.40 he's being evaluated by a nurse. McCain explains that she recalls specifically that when she made those observations in that paragraph, he was in the detox cell. And the record is clear that he was only in the detox cell after 8.30, after being in the restraint chair. And there also, it would be, there's five other folks who checked on him from 5 to 7, multiple times, several of them, during this 2.5 hours where that paragraph appears to fit in her incident report. None of them are defendants here. None of them observed anything in that time. There's no other facts from this two-hour period other than the misplaced paragraph from Ms. McCain. Have I answered your question? Yeah, thank you. Counsel, you're rebuttaled. You can continue if you like or reserve. I'll take a seat and save a little time. Thank you. Mr. Murphy, when you're prepared, please proceed. Good morning. May it please the court. I'm Lawrence Murphy from Tulsa, Oklahoma. I know I have a short amount of time, but I would like to thank this court and especially the clerk for expediting my permission to practice before you here this morning. It's an honor to be here. It really is. Thank you. As this court knows, Amos Reese died on February 25, 2018. Yet another in the long, long line of tragic deaths from the scourge of drug addiction. Some of the important things to remember before we talk about why this case should be affirmed and sent back to the district court for trial. Mr. Reese was, he arrived at the Benton County Detention Center at 4.42 a.m. on February 25th, same day he died. His intake lasted from 4.44 a.m. to 4.50 a.m., approximately six minutes. Mr. Reese was never booked into the Benton County Detention Center despite being there for five hours and 20 minutes. The booking process is where significant health questions are asked. The booking process is where additional assessment is done. Booking was never done. That will become important as part of our, as part of my presentation today. Is the record sure why? Was it because of the hour? What rationale? A specific reason has not been given, but it appears from the record and it certainly is a record, that he was not booked because of his behavior and because of the serious medical conditions that he was experiencing. That is a reasonable inference to draw. He was, as the court noted earlier, I think it was Judge Strauss, he was going downhill, getting worse as the hours progressed. And so that critical information was never asked of him. Now, he left the hospital. So what in this case, the appellate McCain, what did she know and when did she know it that would have created liability in terms of being able to know that this person was under relevant precedent suffering a serious medical event? With regard to Sergeant Desiree McCain, I have it at the latest, 759 AM. And the reason why I have it there, and I have a different time for some of these other defendants, but for Sergeant McCain, 759 at the latest is when she knew that there were objective symptoms that she had witnessed and knew about that put her on notice that this man needed medical care. Does it matter that at that time the appellate decedent was receiving medical attention? That, respectfully, that depends on, the straight answer to that question is no, it does not matter. There is an independent obligation, a constitutional violation. These detention officers, both at the Benton County Detention Facility and throughout the country, they can't delegate their obligation to protect the constitutional right. What greater steps should she have taken? I mean, if something is already happening, there's nothing for her to do. So what, are you suggesting she should have done something on top of what was already occurring? So I'm going to be very specific. The nurse saw Amos, Mr. Reese at 750 AM. At 759, all of this additional new information, excuse me, all of this new additional information was coming in to this particular detention officer. Specifically, Mr. Reese was frantic. Mr. Reese could not hold a conversation. Mr. Reese had random comments about family members. Mr. Reese admitted that he had consumed or ingested meth. She was aware that Mr. Reese was potentially intoxicated. She knew that Mr. Reese conduct was getting worse, dramatically, not better. She even noted that Amos seemed unwell. But what did she fail to do? To get the nurse back to the patient or to call 911. I think the authorities in this circuit, specifically McRaven versus Sanders, stand for the proposition that there is more than simply saying, oh, there's a nurse involved in the process now. Do we, is there a case where liability has been found for that there was still liability on the part of detention personnel not to seek greater professional attention? Yes, I believe McRaven stands for that proposition. It does. In the general belief in those cases or the proposition in those statements is simply this. That just because there's a nurse on staff or just because a nurse has checked at some point in time on this patient, that this patient, this inmate is on the nurse's radar, so to speak, that does not alleviate the detention officer's responsibility because that's who's bringing that new information. That's who's receiving that new information. I think one of the cases you cite, however, involved a situation in which the person knew that the nurse was suffering from a misapprehension. Yes. I think that's not this case as far as I can tell. Whether it's misapprehension or less than all the facts, I would respectfully argue to you that's a distinction without a difference because you have... She should have told the nurse is what you're saying. Yes, sir. Okay. That's an answer. Thank you. Is there a dispute? Oh, sorry, Judge Arnold. Did you want to follow up? No, that's fine. Thank you. Is there a dispute about who called Nurse Stevens? Because Nurse Stevens says Hobelman was the one that came and got her. McCain testified or said that she was involved in getting the nurse, as you heard opposing counsel say. So I don't know that there's a dispute there, but I want to know if in your view there's a dispute there. No. In my view, it was detention officer Hobelman who called and only Hobelman who called. Okay. So the answer is yes, based on what my esteemed colleague said a few moments ago. What I'm supposed to... I'm sorry. Go ahead. No, please go ahead. No, please. I didn't... Well, I was just going to ask, I was going to change the subject just slightly, just to say what implications, how significant is it that your client, I know he was under the influence of drugs and a little frantic and maybe hallucinating or whatever the case may be, but he kept saying, he kept sort of minimizing the meth. Like when he was asked, did you take more than you usually do? He says a little. And at no point did he say, I took a plastic bag full of meth and ingested it. And so he, I understand he wasn't well, but he minimized it too. Is there any significant... And that's undisputed. Was there any significance to that in terms of how the officers responded, whether we cut them a little more slack? I would respectfully argue, Judge Strauss, it's the opposite. And I think if you look at the qualified immunity analysis and you look at these cases that talk about the objective, what the officers objectively knew, what they observed, arguably what they saw, what was happening that they were observing with their senses. Because the flip side of that argument is, you are basically, not you, Judge Strauss, but one would be saying, I have this highly intoxicated person, am I supposed to rely on this highly intoxicated person for an accurate, complete, reasonable medical history, when at the same time he's speaking in an essentially word salad? He's not making sense to any of the other detention officers. His behavior is so erratic, even if he was able to articulate, I swallowed a bag of meth, who's to say that that's reliable? I think that's why that first prong, when you're looking at what are the objective symptoms that these detention officers are relying on, it has to be what they're seeing and what they're looking at. And I think the authorities in the 8th Circuit bear that out. That's fair, but I wonder whether it's so unlikely, and maybe I haven't seen a 5 years where somebody has taken a plastic bag full of meth and ingested it, that the officers would never have reached that conclusion. They may have reached the conclusion that maybe he took a little too much, but a little too much is very different than ingesting a bag of meth. And if he doesn't tell them, I wonder how they can know that. Judge Strauss, you raise an excellent point, which there is a difference between ingesting meth and using meth. If they were asking him, how much meth did you use, and he said, more than the usual amount, a small amount more, I'm not going to try to convince you that it's greater than what it is. The record's very clear on that point. But ingesting meth is a completely different, that is not a recognized methodology by which meth is used. That's a recognized methodology for death, is what that is. And so, respectfully, when anybody heard ingested meth, that is a red flag, for sure. Now, we have talked a great deal about one particular detention officer. If I may, and I'm happy to continue to answer any questions the judges have. Well, I have a question that may be relevant to what you're about to say, because it hangs over the entire case, and that's the question of clearly established law. Was McCain's inactivity a violation of clearly established law? I would say in the 8th Circuit, absolutely, based on precedent on precedent type argument, in Barton v. Tabor, this court stated, in both McRaven and Grayson, we considered the severity of the intoxicated detainee's symptoms and the context in which the symptoms presented. Thus, a reasonable officer in 2011 would have recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding Certainly, that passage was written by this court, a reasonable detention officer. Which case was that from? That is Barton v. Tabor, 820 F3rd 958, 2016. Does that case have time references in terms of how long the person was within the observation of those who were defendants? In Barton v. Tabor, I'm going to bear with me, I'm working on that answer. At Barton v. Tabor, the officers were found to be deliberately indifferent because the plaintiff could not answer questions, the plaintiff could not sit without falling over, and they deceded, if you will, or the injured party. The inmate was unresponsive such that an officer had to check his pulse. As far as the time that elapsed, honestly, your honor, I don't know whether the case speaks to the specific amount of time. If it did, I didn't include it in my notes. I'm not going to be so bold as to start reading the case in front of you three. There are, I would encourage the court with the minute that I have left, Thompson v. King, Grayson v. Ross, McRaven v. Sanders, and Barton v. Tabor are four cases where the court has declined to find qualified immunity and where they have found qualified immunity. One in particular, Thompson v. King from 2013, one officer was found not to be deliberately indifferent. Looking at the facts that those courts relied on, comparing them to the facts, I stray from the microphone, I apologize, comparing them to the facts that these officers had, including the very first intake officer who only had a six-minute interaction. I'm not going to sit here and try to convince anyone that that six minutes was wrong, but after that six minutes, he learned of seizure-like activity in the patrol car. That was enough under Eighth Circuit precedent. I am respectfully out of time. I apologize. What he said was he was acting like he was having a seizure. Isn't that correct? Yes, acting like he was having a seizure. He was just pretending to have them, as in acting like, rather than, we don't, I mean, it's equivocal. It certainly is, yes, it's equivocal, and it certainly leads to the possibility that reasonable jurors could find either way, which is why we respectfully request that the court affirm the district court's decision and send us back for a trial. Anything else, your honors? Don't believe so. Again, thank you for the privilege of practicing in your court. It is absolutely stunning. Thank you. All right. Thank you, Mr. Murphy. Mr. Jorgensen. Thank you, your honor. And like my friend, Mr. Murphy, I also thank you for the privilege of practicing in this court. I've never been in the en banc courtroom. It is quite amazing. Officer McCain, you just heard from- I'm sorry, counsel. Could you pull the microphone up a little? Yes, I will speak. Is this better? You might want to move it around a little. I'll get in it. You can raise the podium there. There's a button on your left, on your right, I think. If I just speak into the mic, does that work, or do you want- Yes, that's fine. Okay. Thank you. You just heard from Ms. Reese's lawyer that the time when McCain should have had knowledge of a serious risk to Mr. Reese's health was 759 AM, which is when she interviewed him. This is also after a nurse is on scene providing care, and it is after McCain has already placed him, ordered him to be placed, she didn't do it, ordered others to put him in a restraint chair for his own safety because he had been punching the wall. This is when she is following up on that out of concern for his safety and his medical condition. She is doing something at that very moment in time, and it's his responses that would at least, right? And you also heard that what she should have done at that time is summon the nurse again or call an ambulance. But you also, Judge Smith, you identified correctly that there's no Eighth Circuit case that holds that that's what should happen under those circumstances. There is McRaven where qualified immunity was denied of jail officials even though a from the moment that person came into the jail that he was intoxicated on a cocktail including dangerous drugs, of drugs. They even tested him and confirmed others and got a longer list from him, an interview at the front end. They knew about all these drugs in his system and did not tell the nurse that he was on drugs at all. They let her believe that he was just drunk. And that was the problem at McRaven, that they did not deliver that information to the nurse. There was no such information for anyone to deliver to the nurse in this case. Nobody knew what or how much Mr. Reese was or was not high on because he hadn't told anybody until after the nurse. Would that be necessary though if the conditions that were being shown were of such severity that regardless of the underlying cause there was a reasonable demonstration of a need for emergency treatment? I don't know how you determine when a reasonable person without medical background knows to elevate from nurse to emergency treatment. What the standard is about is medical care. And is there a medical issue? Does this person need medical care? And deliberate indifference means you cannot walk away from that situation and do nothing if you believe there is a medical situation and a need for medical care. They satisfied that part of the deliberate indifference standard because the nurse was on scene and McCain knew that whether she asked the nurse to come or not, she knew he was placed right there in front of her in the restraint chair. So she sees everything that happens from the time he's in the restraint chair until an hour later when he moves to the detox cell. So she knew the nurse had already been summoned whether she summoned the nurse or not. And she saw that he was under nurse's care and she still went and interviewed him herself anyway also to try to determine some details about what's going on with him but she was not able to get good information from him. So she still really had no more knowledge after that conversation than she did before other than trying to guess based on his responses at what level of intoxication or danger he was in when she's not a medical professional but there is a nurse and in fact two nurses who are evaluating him for exactly that purpose. My time is up. All right. Thank you, your honors. Thank you, Mr. Jorgensen. Thank you also, Mr. Murphy. The court appreciates both counsel's participation and argument. We have found it helpful and we'll take the case under advisement. Thank you.